UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


MARY TALHELM,

       Plaintiff,

                                        Case No. 07-CV-13739
vs.                                  HON. GEORGE CARAM STEEH


ABF FREIGHT SYSTEMS, INC.,
a Delaware corporation,

       Defendant.

_____/

## ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (#22)

Defendant ABF Freight Systems, Inc. moves for summary judgment of plaintiff Mary Talhelm's claim that she was discharged in violation of Michigan's Whistleblowers' Protection Act (WPA), M.C.L. §§ 15.621, et seq..  A hearing on the motion was held on June 28, 2008.  For the reasons set forth below, ABF's motion will be GRANTED.

## I. Background

Mary Talhelm filed a one count complaint on September 5, 2007 alleging she was employed as an administrative assistant at ABF's Flint, Michigan shipping terminal from 1998 until she was discharged on July 10, 2007 by Terminal Branch Manager David Pike. Talhelm alleges her discharge violated Michigan's WPA because a substantial factor motivating Pike's decision to terminate her was that Talhelm had informed ABF "that she was about to complain about violations of law to a government entity, specifically local law enforcement authorities."  Complaint, ¶ 13, at 2.

The record before the court shows that Pike managed the ABF Flint Terminal, and

was Talhelm's direct supervisor. Pike also supervised Sales Representative Jeff McNamara, day-shift Operations Supervisor Jeremy Wasiliewski, and afternoon-shift Operations Supervisor Ashley Ward. As Operations Supervisors, Wasiliewski and Ward supervised the truck drivers. Plaintiff Talhelm's husband Tim Talhelm has been a driver at the Flint Terminal since 1988, and is a member of the Teamsters' Union.

## A. Two Incidents of Talhelm "Threatening to Report" Pike

Talhelm testified that she first threatened to report Pike in May 2007 after her husband Tim was given a written warning for using a sick-day to attend a dentist appointment in violation of an ABF company rule. Tim filed a Union grievance. Talhlem testified to Pike's reaction after the Union steward handed him Tim's grievance:

> A. [by Talhlem] [H]e threw it down, wasn't going to sign it, he had whoever I believe was the supervisor sign it. He was slamming the doors. He was very angry when he came [into the office], and I had enough of this violence.
>
> Q. Had Dave [Pike] ever committed violence toward you?
>
> A. No.
>
> Q. What violence are you talking about, slamming doors?
>
> A. Slamming the doors, slamming the phone, slamming computers, slamming chairs, calling the drivers assholes. Just very angry. Having his fists clinched.
>
> *     *     *
>
> Q. What did you do?
>
> A. I told him if he didn't straighten up, I was going to report him.
>
> Q. For what?
>
> A. For everything. Violence, embezzlement, using company property. I didn't say it out loud. This is what I am going to report him for.
>
> *     *     *

A. Dave came into the office slamming doors, and I told him, "Dave, if you don't straighten up, I'm going to report you."

Q. And he said what?

A. He didn't say anything. He looked at me, got red in the face, went in his room, picked up the phone, made a phone call, slammed the phone down, went back out on the dock, put his hands behind his back like he always does when he's mad.

\* \* \*

Q. Did you ever say to Dave, I'm going to report you to somebody outside the company?

A. No.

Talhlem February 19, 2008 Tr., at 84-88.

According to Talhelm, the second incident occurred in early June 2007 and involved "petty cash." Talhelm explained that a maximum of $100.00 was kept in a lockbox for use by office employees to purchase supplies, birthday gifts for fellow employees, and the like. Pike had the only key to the lockbox. When money was taken out of the lockbox, a paper receipt was to be placed in the box. Talhelm was responsible for reporting and balancing this "petty cash," and when the money ran low, she asked ABF corporate offices for money to bring the total back to $100.00. Talhelm testified that Pike would take money from the "petty cash" box without leaving a receipt, and when someone else in the office needed cash and the money wasn't there, she would have to ask Pike to reimburse the money. Talhelm admitted that Pike "always paid the money back," but complained that she sometimes had to wait for Pike to reimburse the funds. Talhelm testified that, in early June 2007:

A. [By Talhlem] I discussed with him that taking money out of petty cash was illegal, and that if he didn't stop, I was going to report it.

Q. Did you say to whom?

A. No.

Q. What was the context? Why were you talking about petty cash?

A. Because I'm tired of the way he was running the company, and I was tired of the way he was bullying everybody, and I was tired of the way he was being violent, and I finally stood up to him and I was not going to deal with it any more.

*　　*　　*

Q. I'm just trying to understand. Nothing happened that day with regard to petty cash?

A. No. I had been doing petty cash reports, and I wasn't going to do any more of the making it balance.

Q. What did he say when you said, "I'm going to report it?"

A. He didn't say anything. He looked mad, red in the face, walked away.

*　　*　　*

Q. Did you ever say to Dave or anybody else in management at ABF that you were going to report Dave to some agency outside of the company?

A. No.

Talhlem February 19, 2008 Tr., at 89-91. Talhelm also testified that she had told the prior Terminal Manager Les Barker "a couple of years ago" that Pike was taking money out of "petty cash." Id. at 104.

It is undisputed that Talhelm has never reported Pike to a public body. Id. at 107. Talhelm also admitted at her deposition that, contrary to the allegations in her Complaint, she never told Pike that she was going to file a complaint with local law enforcement authorities. Id. at 107.

**B. Other Evidence**

Pike reported to Regional Vice President of Operations Jeff Slobodnik, and Regional Vice President of Sales Jerry Bergman. Slobodnik reported to Vice President of Terminal Operations Murray Babb, while Bergman reported to Vice President of Sales Jim Keenan.

ABF proffers evidence that Pike and Slobodnik met in July or August of 2006, one year before Talhelm was discharged, and discussed the possibility that Pike may be required to eliminate driver and office positions at the Flint Terminal due to decreasing sales revenues and increasing costs. Slobodnik did not give Pike a specific time frame. ABF uses an "Operations Ratio" to indicate how well a terminal is performing. A Ratio over "100" indicated that costs at a given terminal were exceeding sales, and that the terminal was losing money. For the months of October 2006 through January 2007, the Operations Ratios for the Flint Terminal were, respectively, 102.1, 103.5, 105.3, and 110.9. On February 1, 2007, Slobodnik e-mailed all of his Terminal Branch Managers and instructed them to either make needed office labor reductions as soon as possible, or let him know what was preventing the labor adjustments. Defendant's Exhibit 7. Pike responded to the e-mail that same day: "Jeff, I have one full time office person (Mary [Talhelm]) and she works no overtime." Id. Four months later, in June 2007, Slobodnik instructed Pike to eliminate one of the four Flint Terminal office positions, Sales Representative McNamara, day-shift Operations Supervisor Wasiliewski, afternoon-shift Operations Supervisor Ward, or Administrative Assistant Talhelm. Pike testified he chose to eliminate Talhelm's position because it would be "the least painless" to Terminal operations.

In the interim, in May 2007, around the time of her husband's Union grievance, Talhelm called ABF Chief Auditor Lavron Morton. Talhelm did not identify herself to

Morton, stating only that she was a supervisor. Talhelm "anonymously" complained to

Morton that Pike was using "petty cash" and stamps for his own personal use, and that Pike

and Sales Representative McNamara were buying each other lunch using company funds,

were not working, and were instead playing golf and pool. Pike's and McNamara's expense

reports were audited as a result, and Slobodnik and Bergman conducted an investigation.

ABF Vice President Keenan e-mailed Morton on June 28, 2007:

> Lavron,
>
> Both [Regional Vice Presidents Slobodnik and Bergman] visited [the Flint Terminal] this week and are convinced the allegations about buying each other lunch and expensing it are untrue. They confronted the sales rep [McNamara] and manager [Pike] separately, and both convincingly denied any such activity. As previous emails indicated, the manager is now fully engaged with better work habits and communication with the terminal personnel. As you may recall in [sic], the manager terminated a previous sales rep who was expensing lunches that were not attended by a customer.
>
> The driver causing all the grief is basically disliked by everyone except his wife, the clerk in the office [Talhelm]. Perhaps she actually was the one who spoke to you, posing as the female operations supervisor. I did not disclose anything about the caller to the [Regional Vice Presidents Slobodnik and Bergman] and they did not share the fact that a call was even made to [you] in their visit. They are convinced the call came from either the driver or the clerk. Even the new union steward recognizes the driver is a major issue and is cooperative with us to find a solution.
>
> Jim Keenan

Plaintiff's Exhibit 11.

Talhelm was discharged on July 10, 2007. On July 12, 2007, Slobodnik e-mailed

Vice President Babb:

> . . . . To explain how the supervisor costs affect the office job in Flint it is important to know that the clerk there was unable to perform the duties of a supervisor. It is also important to know that we were not able to train her or offer her the job due to the fact that she is married to one of the dock employees. Company policy will not allow her to supervise a family member. Since the manager and the supervisor(s) were able to absorb the clerical

6

duties the decision was made to eliminate the position of office clerk. As stated above the position was eliminated so Mary [Talhelm] received severance pay in accordance with company policy as did other employees whose jobs were eliminated earlier in the year. This reduction was discussed during the first quarter with Dave [Pike] but we decided to wait to see if revenue increased.

I would like to recap a conversation that I had with Lavon Morton and Jim Keenan yesterday. I was told by Lavon that Mary [Talhelm] called him and made the accusation that her job was eliminated out of retaliation. My response to this was that we have to run our business and the job elimination was due to economic reasons as explained in this email. The major point that I want to comment on concerning that conversation is that I did not know that Mary was calling [Lavon Morton at] Fort Smith. I was never given that information and I reminded Jim and Lavon of that fact during our call. Before the call ended Lavon did tell me that Mary did say that she felt her job was eliminated due to business levels.

Plaintiff's Exhibit 13.

## II. Standard of Review

Federal Rule of Civil Procedure 56(c) empowers the court to render summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." See Redding v. St. Eward, 241 F.3d 530, 532 (6th Cir. 2001). The standard for determining whether summary judgment is appropriate is "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" Amway Distributors Benefits Ass'n v. Northfield Ins. Co., 323 F.3d 386, 390 (6th Cir. 2003) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 251-52 (1986)). The evidence and all reasonable inferences must be construed in a light most favorable to the non-moving party. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986); Redding, 241 F.3d at 532 (6th Cir. 2001).

If the movant establishes by use of the material specified in Rule 56(c) that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law, the opposing party must come forward with "specific facts showing that there is a genuine issue for trial." First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 270 (1968). See also McLean v. 988011 Ontario, Ltd., 224 F.3d 797, 800 (6th Cir. 2000). Mere allegations or denials in the non-movant's pleadings will not meet this burden, nor will a mere scintilla of evidence supporting the non-moving party. Anderson, 477 U.S. at 248, 252. Rather, there must be evidence on which a jury could reasonably find for the non-movant. McLean, 224 F.3d at 800 (citing Anderson, 477 U.S. at 252).

## III. Analysis

ABF moves for summary judgment of Talhelm's claim that she was discharged in violation of Michigan's WPA. M.C.L. § 15.362 of the WPA reads in pertinent part:

> An employer shall not discharge . . . an employee . . . because the employee . . . reports or is about to report, verbally or in writing, a violation or a suspected violation of a law or regulation or rule promulgated pursuant to law of this state, a political subdivision of this state, or the United States to a public body, unless the employee knows that the report is false, or because an employee is requested by a public body to participate in an investigation, hearing, or inquiry held by that public body, or a court action.

(emphasis added). A "public body" is defined under the WPA to include "[a] law enforcement agency or any member or employee of a law enforcement agency." M.C.L. § 15.361(d)(v). To establish a prima facie WPA claim, the plaintiff must show: (1) she was engaged in activity protected by the WPA; (2) she was discharged; and (3) a causal connection between the protected activity and the discharge. Shallal v. Catholic Social Services, 455 Mich. 604, 610, 566 N.W.2d 571 (1997). Under the "about to report" protected activity prong of M.C.L. § 15.362, the plaintiff must show: (1) by clear and

convincing evidence that she was about to report a violation or suspected violation of law; and (2) that the person who fired her was aware that she was about to make a report before she was fired. Jennings v. County of Washtenaw, 475 F.Supp.2d 692, 711 (E.D. Mich. 2007) (citing Shallal, 566 N.W.2d at 575, and Kaufman & Payton PC v. Nikkila, 200 Mich.App. 250, 257-58, 503 N.W.2d 728 (1993)). "An employee who is 'about to report' a violation or a suspected violation is one who 'is on the verge of' doing so." Jennings, 475 F.Supp.2d at 711 (citing Shallal, 566 N.W.2d at 575). The person who fired the employee must have "objective notice" that the employee was about to report a violation of law to a public body. Jennings, 475 F.Supp.2d at 713.

Talhelm concedes, as she must, that to succeed at trial on her WPA claim, she must proffer "clear and convincing evidence" that she was "about to report" a violation or suspected violation of law to a public body. Jennings, 475 F.Supp.2d at 711. The Michigan Supreme Court has recognized that the "clear and convincing evidence standard" is "the most demanding standard applied in civil cases," a standard that has been incorporated into Michigan statutory enactments. See In re Martin, 450 Mich. 204, 226-27, 227 n.22, 538 N.W.2d 399 (1995) (recognizing that Michigan's patient advocate act, M.C.L. § 700.496(6), incorporates a "clear and convincing evidence" standard for determining whether a patient would allow treatment to be withheld if such would lead to his death).

> Evidence may be uncontroverted, and yet not be "clear and convincing." . . . Conversely, evidence may be "clear and convincing" despite the fact that it has been contradicted.

In re Martin, 450 Mich. at 227 (quoting In re Jobes, 108 N.J. 394, 407-08, 529 A.2d 434 (1987)).

Talhelm's initial procedural argument that she was not required to proffer "clear and

convincing evidence" in opposing ABF's motion for summary judgment, but only evidence creating a material factual dispute whether she was about to report Pike to a public body, is inaccurate. In responding to ABF's motion, Talhlem was required to produce evidence on which a reasonable jury could find that ABF violated the WPA as alleged, that is, that ABF discharged her because she was about to report Pike to public law enforcement authorities. McLean, 224 F.3d at 800. To arrive at this conclusion under Michigan law, the jury's finding must be supported by "clear and convincing evidence" that Talhlem was about to report Pike to a public body. Jennings, 475 F.Supp.2d at 711. Without such "clear and convincing evidence," ABF would be entitled to summary judgment due to an absence of evidence presenting "a sufficient disagreement to require submission to a jury[.]" Amway Distributors, 323 F.3d at 390. Whether contradicted or uncontroverted, disputed or undisputed, Talhlem was required to proffer "clear and convincing evidence" that she was "about to report" Pike to a public body. Jennings, 475 F.Supp.2d at 711; In re Martin, 450 Mich. at 227.

"Evidence is clear and convincing when it produce[s] in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue." In re Martin, 450 Mich. at 227 (quoting In re Jobes, 108 N.J. at 407-08). See also Michigan Civil Jury Instruction 8.01(b), "Definition of Burden of Proof" ("To be clear and convincing, the evidence must be strong enough to cause you to have a clear and firm belief that the proposition is true."). A "preponderance of the evidence" is evidence which allows a jury to conclude that it is "more likely than not" that a proposition of fact occurred. See

Weymers v. Khera, 454 Mich. 639, 647, 563 N.W.2d 647 (1997). See also Michigan Civil Jury Instruction 8.01(a), "Definition of Burden of Proof" ("I have just list for you the propositions on which the [plaintiff] has the burden of proof. For the [plaintiff] to satisfy this burden, the evidence must persuade you that it is more likely than not that the proposition is true.").

Construing the pleadings and record evidence in a light most favorable to Talhlem, and even applying the less demanding preponderance of the evidence standard, a reasonable jury could not find that Talhlem was more likely than not "about to report" a violation or suspected violation of law to a public body, or that Pike had objective notice that Talhelm was about to report a violation or suspected violation of law to a public body. Amway Distributors, 323 F.3d at 390; McLean, 224 F.3d at 800; Shallal, 455 Mich. at 610; Jennings, 475 F.Supp.2d at 711. In addition, a reasonable jury could not find on this record a causal connection between the WPA protected activity of "about to report" a violation or suspected violation of law to a public body and Talhelm's July 10, 2007 discharge. Amway Distributors, 323 F.3d at 390; McLean, 224 F.3d at 800; Shallal, 455 Mich. at 610.

In Shallal, relied upon by Talhlem, an employee of the non-profit social service agency Catholic Social Services of Wayne County (CSS) discussed with a CSS Board Member CSS President Quinn's alleged violations of rules promulgated by the Michigan Department of Social Services (MDSS). Shallal, 455 Mich. at 606. The Board Member suggested that the employee, plaintiff Shallal, report these alleged violations to the CSS Board and accrediting bodies such as the MDSS. Id. Shallal did not take action at that time because she feared that her job would be in jeopardy. Id. at 607. In a later incident involving Shallal's supervision of an adoption, Shallal notified the MDSS that the adopted

baby had suffered injuries resulting from "shaken baby syndrome." Id. MDSS cited CSS

with several violations of MDSS rules, and was critical of both Shallal and CSS. Id. As was

its practice, MDSS personnel met with CSS President Quinn on April 17, 1991 before

issuing a formal agency report. Id. at 607, 613.

> After the meeting with [MDSS] officials, [CSS President] Quinn called Shallal
> into his office. The ensuing discussion became heated. Shallal stated her
> intention to report Quinn's abuses of alcohol and agency funds if he failed to,
> in her words, "straighten up."

Id. at 607-08. To support her WPA claim that she was "about to report" Quinn to the public

body MDSS, and in opposition to CSS's and Quinn's motion for summary disposition in

state court, Shallal proffered her own deposition testimony as augmented by written

"mental notes" and personal calender entries she had made during the relevant time

period. Id. at 613-14. According to this evidence: (1) Shallal told Quinn at the April 17,

1991 meeting that "You're so busy drinking and misusing money that you don't care. And

if you don't straighten up . . . I will report [you] to the department, to the board, anybody,

everybody"; and (2) Shallal talked to a fellow CSS employee on April 10, 1991 "'about Tom

[Quinn] wanting to fire me. We need to report him.' And I had slash (/) 'DSS'." Id. at 614.

A plurality of the Michigan Supreme Court "disagree[d] with the Court of Appeals that

plaintiff [Shallal's] statement, 'if you don't straighten up . . . I will report you,' coupled with

her other actions, [did] not satisfy the 'about to report' language under the act." Id. at 615.

A majority of the Court went on to affirm summary disposition in favor of CSS and Quinn,

however, on the issue of causation. Id.

In contrast to the evidence proffered by the Shallal plaintiff, Talhelm's evidence in

support of her claim that she was "about to report" Pike to "a government entity, specifically

local law enforcement authorities," is limited to Talhelm's deposition testimony that she told

Pike "if he didn't straighten up, I was going to report him," and that "if he didn't stop [taking money out of petty cash], I was going to report it."  Unlike Shallal, who threatened to "report [Quinn] *to the department*, to the board, anybody, everybody," Talhlem testified that she never told Pike or anyone else at ABF that she was going to report Pike to a person or agency outside of ABF.  Talhelm February 19, 2008 Tr. at 88, 91.  Talhelm's proffered evidence relative to the context of her statements, including her reference to taking "petty cash" without a receipt as being "illegal," fails to raise a reasonable inference, let alone a clear and firm inference,  that she was "on the verge of" reporting Pike to anyone other than ABF personnel.  Jennings, 475 F.Supp.2d at 711.  The circumstantial evidence in Shallal raised a clear inference that "the department" Shallal was referring to when she threatened to report her supervisor was MDSS, a state agency authorized to regulate and sanction her supervisor and her employer CSS.  Talhlem has not identified the public body that she was "about to report" Pike to for slamming doors, phones, chairs, and computers, clinching his fists, calling driver's "assholes," and taking "petty cash" from a lockbox without leaving a receipt.

        The undisputed evidence shows that Talhelm carried through with her May 2007 threat to report Pike for the unspoken reasons of "[v]iolence, embezzlement, [and] using company property" when she called ABF's Chief Auditor Morton.  Morton is undisputedly not a member of a "public body" for purposes of the WPA and M.C.L. § 15.362.  See M.C.L. 15.361(d)(v).  Keenan's June 28, 2007 e-mail to Morton indicating that he, Keenan, did not "disclose anything about the caller" to Slobodnik and Bergman before they visited the Flint Terminal in late June 2007, that Slobodnik and Bergman "are convinced the call came from either the driver or the clerk [Talhlem]," and that Slobodnik and Bergman "did

not share the fact [with Pike or McNamara] that a call was even made," establishes that Slobodnik and Bergman knew a call had been made to Auditor Morton, and that Slobodnik and Bergman had a strong suspicion that Talhelm was the caller. Slobodnik's July 12, 2007 e-mail to Babb, indicating that he, Slobodnik, "was never given [the] information that" it was Talhlem who called Morton, likewise supports a reasonable inference that Slobodnik believed Talhelm had been the caller. Assuming for purposes of this motion that Slobodnik shared his suspicions with Pike that Talhelm had called Morton, such does not raise a reasonable inference that Talhlem was "about to report" Pike to a public body, or that Pike was thereby given objective notice that Talhelm was "about to report" him to law enforcement officials or some other public body. Shallal, 455 Mich. at 610; Jennings, 475 F.Supp.2d at 711. Proving at trial that Pike stopped speaking to Talhelm in July 2007 and discharged her in retaliation for reporting him to ABF Auditor Morton would not support an actionable WPA "about to report" claim. Jennings, 475 F.Supp.2d at 711.

Also, even if Talhelm had proffered sufficient evidence to allow a reasonable jury to conclude that Pike was objectively aware that Talhelm was about to report him to a public body, Talhelm has failed to proffer evidence that could support a finding of a causal connection between Talhelm's alleged protected activity and her discharge. "[A] temporal relationship, standing alone, does not demonstrate a causal connection between [a] protected activity and any adverse employment action. Something more is required to show causation." Jennings, 475 F.Supp.2d at 713 (quoting West v. General Motors Corp., 469 Mich. 177, 186, 665 N.W.2d 568 (2003)). Finally, Talhelm has not proffered evidence that could support a finding that Pike used legitimate business reasons as a pretext for discharging Talhlem in violation of the WPA. Jennings, 475 F.Supp.2d at 713-14. The

record shows Slobodnik informed Pike eight months before Talhlem first confronted Pike in May 2007 that positions at the Flint Terminal may need to be eliminated due to the Terminal's declining economic performance, a decline that continued through January 2007. Slobodnik directed Pike and other Terminal Branch Managers in February 2007 to make office labor reductions. Pike testified that he chose to eliminate Talhelm's Administrative Assistant position because it would be "the least painless" to Terminal operations. Talhlem does not dispute that, pursuant to established company policy, she could not serve as one of the two Operations Supervisors because she could not hold a supervisory position over her husband. Talhelm does not argue that she was qualified to function as the Terminal Sales Representative. The fact that Talhelm's position was the lowest paying position does not displace Pike's assessment that, given the responsibilities of the varied office positions, elimination of Talhelm's clerical position would have the least impact on Terminal operations. Talhlem does not dispute that she was not replaced, or that her job duties were absorbed by the remaining Terminal staff. Challenging the wisdom of Pike's decision to eliminate the office position he perceived would have the least impact on the Terminal's operations rather than the lowest paying position does not establish pretext. Jennings, 475 F.Supp.2d at 715 (citing Town v. Michigan Bell Telephone Co., 455 Mich. 688, 704, 568 N.W.2d 64 (1997)). Construing the pleadings and evidence in a light most favorable to Talhelm, a reasonable jury could not find a causal connection between Talhelm's discharge and WPA protected activity. Amway Distributors, 323 F.3d at 390; McLean, 224 F.3d at 800; Jennings, 475 F.Supp.2d at 713-15.

## IV. Conclusion

ABF is entitled to summary judgment of Talhelm's WPA claim in the absence of clear and convincing evidence, or even a preponderance of evidence, that would allow a reasonable jury to conclude that Talhelm was "about to report" a violation or suspected violation of law to a public body. Amway Distributors, 323 F.3d at 390; McLean, 224 F.3d at 800. ABF is also entitled to summary judgment of Talhelm's WPA claim in the absence of evidence that would allow a reasonable jury to conclude that it was more likely than not that Pike or ABF had objective notice that Talhelm was "about to report" a violation or suspected violation of law to a public body, that a causal connection existed between conduct protected by the WPA and Talhlem's discharge, or that Pike's choice of eliminating Talhelm's Administrative Assistant position based on business considerations was merely a pretext for retaliation in violation of the WPA. Amway Distributors, 323 F.3d at 390; McLean, 224 F.3d at 800. Accordingly,

Defendant ABF's motion for summary judgment is hereby GRANTED. Plaintiff Mary Talhelm's WPA claims are hereby DISMISSED with prejudice.

SO ORDERED.

Dated: November 7, 2008

s/George Caram Steeh
GEORGE CARAM STEEH
UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on November 7, 2008, by electronic and/or ordinary mail.

s/Josephine Chaffee
Deputy Clerk

---